IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ASSUREDPARTNERS OF
OREGON, LLC,

       Plaintiff,

  v.

G. SCOTT REESE, SUSAN REESE,
CARL SWAN, ALEX WHIPPLE, S&S
INVESTMENTS MANAGEMENT, LLC,
SHANNON R. HOLT, BRUCE DENSON,
JR., COBBS ALLEN CAPITAL, LLC,

       Defendants.

Civ. No. 6:22-cv-00673-MC

OPINION AND ORDER

**MCSHANE, Judge**:

      Plaintiff AssuredPartners ("AP"), an insurance brokerage firm, brings this Motion for Temporary Restraining Order and Preliminary Injunction ("TRO") against several former employees and a competitor firm for their alleged breach of contract and trade secret misappropriation. AP argues that absent injunctive relief, AP faces irreparable harm, largely based on loss of client accounts and goodwill. Defendants Scott Reese, Susan Reese, and S&S Investments entered into a Stipulated Preliminary Injunction agreeing to abide by the terms of their restrictive covenants. Defendants Swan, Whipple, Holt, Denson, and Cobbs Allen, LLC, oppose the TRO. Because AP has not shown a likelihood of success on the merits or irreparable harm, AP's Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 34, is DENIED.

1 – OPINION AND ORDER

**FACTUAL BACKGROUND**

In 2015, Defendant Scott Reese sold his insurance business, including his client accounts, to AP for $21.5 million. Pl.'s Second Am. Verified Compl. ¶ 36–37, ECF No. 41. After the purchase, Defendants Reese, Swan, Whipple, and Holt formed a team at AP working in the specialized senior living facility market. *Id.* ¶ 38. Each Defendant signed restrictive covenant agreements ("RCAs") in 2015 as a prerequisite of their employment with AP. *Id.* ¶ 48. Paragraph 2 of the RCAs pertains to "Confidential Information," which means all proprietary, non-public information concerning AP's business or affairs, including AP's clients, prospective clients, rating information, financial condition, and business strategies. *Id.* ¶ 53. Employees agree that all confidential information is the exclusive property of AP, and employees may not use or disclose confidential information for any reason other than as intended during or after their employment with AP. *Id.* Upon termination, employees further agree to immediately deliver to AP all documents and data relating to AP's business. *Id.*

Paragraph 3 of the RCAs pertains to "Non-Solicitation" and "Non-Interference." While employed at AP and for two years after employment ends, an employee may not "directly or indirectly through another person or entity:"

> 3.1.1 offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to, or on behalf of, any Restricted Client;
>
> 3.1.2 take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of [AP], or any other third party with a material business relationship with [AP] to cease or refrain from doing business with [AP]; or
>
> 3.1.3 solicit, hire, engage, or seek to induce any of [AP]'s employees to terminate such employee's employment with [AP] for any reason, including, without limitation, to work for Employee or a competitor of [AP].

*Id.* ¶ 55. A "Restricted Client" means

> 3.2.1 any client of [AP] as of the date of termination of Employee's employment with [AP] . . . which the Employee either: (A) had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or (B) about whom the Employee received Confidential Information; or
>
> 3.2.2 any prospective client of [AP] within the three (3) months immediately preceding the Separation Date as to which Employee either: (A) had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or (B) about whom Employee received Confidential Information.

*Id.* Later in 2015, Defendants Swan and Whipple left AP and returned in 2017. *Id.* ¶ 49. Swan signed a renewed RCA similar to his original agreement upon his return, but Whipple did not. *Id.* ¶ 49–50. Whipple's Non-Solicitation provision from 2015 expired, leaving Paragraph 3 applicable to only Defendants Reese, Swan, and Holt.[1] *Id.* ¶ 50–51.

The events resulting in this litigation began when AP discovered that Defendant Reese operated a "shadow business," S&S Investments, while employed at AP. *Id.* ¶ 58–70. Reese placed certain AP clients in insurance captives, which are separate insurance companies wholly owned and operated by its insured. *Id.* ¶ 62–63. Captives still require a large amount of work by AP, but Reese was directly receiving the broker fees rather than AP. *Id.* ¶ 67–69.

On May 9, 2022, upon learning of the shadow business, AP terminated Reese, along with Swan and Whipple, based on the belief that all three acted in concert. *Id.* ¶ 111. Upon termination, Swan and Whipple failed to immediately return their devices to AP. *Id.* ¶ 112. AP later discovered "a calculated effort by Swan and Whipple to steal AP's trade secret confidential information, an effort that commend ***after*** they had been terminated and designed to facilitate the transfer of AP clients to a competitor." *Id.* ¶ 115. AP claims that Swan and Whipple then

---

[1] The parties dispute the validity of the RCAs and the extent of Whipple's confidentiality obligations. The Court declines to rule on such legal issues at this time as they have no bearing on the TRO disposition.

3 – OPINION AND ORDER

solicited Defendant Holt to follow them to a new brokerage firm, Defendant Cobbs Allen. *Id.* ¶ 123. On May 31, 2022, AP sent a cease-and-desist letter to Defendant Bruce Denson of Cobbs Allen regarding his company's "interference with the contractual and common law rights AP has with Swan, Whipple and its current employees and clients." *Id.* ¶ 131. As of June 3, 2022, AP received notice of multiple broker-of-record letters submitted by AP clients previously serviced by Swan and Whipple. *Id.* ¶ 138. The letters were sent by Cobbs Allen with Whipple as the specific producer. *Id.*

## LEGAL STANDARD

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor" and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). The standards for issuing a temporary restraining order are like those required for a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Ca. 1995). The court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

## DISCUSSION

AP brings twelve claims for relief against various Defendants. *See* Pl.'s Second Am. Verified Compl. Relevant for the TRO are the following: (1) breach of contract against Swan; (2) breach of fiduciary duty against Swan and Whipple; (3) trade secret misappropriation against

Swan, Whipple, Denson, and Cobbs Allen; and (4) tortious interference against Swan, Whipple, Denson, and Cobbs Allen. The Court finds that, at this time, AP has not met its burden in showing a likelihood of success on the merits or irreparable harm.

**I. Success on the Merits[2]**

Generally speaking, AP's claims for breach of contract and fiduciary duty, trade secret misappropriation, and tortious interference each require some evidence of wrongdoing by Defendants. Beginning with the breach of contract claim against Swan, AP must show that Swan's conduct constituted a breach of his RCAs that resulted in damage to AP. *See Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445, 2011 U.S. Dist. LEXIS 134015, at *12 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 927 P.2d 1098, 1101 (Or. Ct. App. 1996)). AP argues Swan breached his RCAs before his termination by helping Reese move AP clients into insurance captives. Pl.'s Mot. TRO 34–35. He further breached his RCAs, AP alleges, by accessing confidential client information after his termination and using it to aid Whipple and Cobbs Allen in soliciting AP's clients and employees. Pl.'s Mot. TRO 34–36. The evidence, however, does not support AP's allegations.

While AP alleges Reese, Swan, and Whipple acted as a team operating the insurance captive practice, Reese submitted a declaration stating Swan and Whipple received no portion of the consulting fees from that business. Scott Reese Decl. ¶ 2, ECF No. 29. Swan and Whipple further declared they "did not manage any captive services for clients," had no plan to "divert clients to captives" serviced by Reese, and were unaware that Reese's consulting company was being paid "directly by captive clients to the exclusion of AP." *See* Swan Decl. ¶¶ 8, 10, ECF No. 58; Whipple Decl. ¶¶ 8, 10, ECF No. 56. AP merely relies on the close relationship between

---

[2] The Court finds AP has not met the lesser "serious questions going to the merits" standard either. For simplicity, this Opinion's reference to "likelihood of success on the merits" encompasses both standards.

5 – OPINION AND ORDER

Reese, Swan, and Whipple to support its allegations without providing any actual evidence showing Swan and Whipple's involvement in Reese's side business. AP's breach of contract claim against Swan based on his alleged self-dealing prior to his termination therefore fails.

As to Swan's conduct after his termination, AP relies on a forensic report of Swan's computer that shows Swan accessed AP files on May 12 and 13, 2022, days after AP terminated him. Pl.'s Mot. TRO, Ex. 3, ECF No. 34-3; Suppl. Vaughn Decl., ECF No. 61. AP's forensic examiner, James Vaughn, declared that Swan visited AP's Equity Holder Portal website, which states "[a]ll information and documents available through this portal are STRICTLY CONFIDENTIAL." Pl.'s Mot. TRO, Ex. 3, at ¶ 11; Suppl. Vaughn Decl. ¶ 11. Swan then signed into his personal email account and sent items. *Id.* Swan also used an AP flash drive to access two files, including a powerpoint and a production report. Pl.'s Mot. TRO, Ex. 3, at ¶ 12. According to Vaughn, "access" is a term used when "a file is manipulated in a way that allows its properties to be changed. 'Accessing' a file could mean transferring the file; however, to determine whether the file was transferred, other devices and/or accounts typically must be analyzed." Suppl. Vaughn Decl. ¶ 14. Vaughn added that "the timing and nature of the activities of Mr. Whipple and Mr. Swan are indicative of a potential transfer of documents and information" from their devices. *Id.* ¶ 15.

Swan and Whipple both deny opening, forwarding, or copying any of the files that Vaughn identified in his forensic report. Swan Decl. ¶¶ 22–23, 28; Whipple Decl. ¶¶ 21, 23–27. Swan and Whipple's own forensic examiner, Joel Brillhart, stated that if Swan had accessed confidential files from AP's portal website or flash drive, there would likely be artifacts showing them being accessed, which are absent here. Brillhart Decl. ¶ 10–11, ECF No. 57. Brillhart further points out that Vaughn's declaration "does not opine that any accessed file was

6 – OPINION AND ORDER

transferred, downloaded, printed, or forwarded," despite these all being "actions that potentially could be determined from a forensic review" of the computers. *Id.* ¶ 13.

AP's evidence falls short of demonstrating that Swan breached his RCAs by accessing confidential information and using it to solicit clients and employees. At the outset, it is unclear whether Swan did in fact access confidential information. Brillhart's declaration casts doubt on the extent of Swan and Whipple's alleged access, and AP presents no evidence that Swan or Whipple downloaded or transferred any of the identified files. AP further does not demonstrate that Swan improperly used the information to violate his Confidentiality and Non-Solicitation RCAs. AP believes Swan is involved in the solicitation of AP clients through his close relationship with Whipple, who is not bound by AP's Non-Solicitation RCA. Pl.'s Mot. TRO 24–25. While the Court acknowledges that a unique dynamic exists between Swan and Whipple, the current record reflects no solicitation by Swan. Swan denies contacting any AP clients since accepting employment with Cobbs Allen, and further accepts that he cannot refer AP clients to Whipple or Cobbs Allen if they contact him. Suppl. Swan Decl. ¶ 2–3, ECF No. 67. Additional discovery could reveal misconduct, but AP's contentions are entirely speculative at this point. AP therefore failed to demonstrate a likelihood of success on its breach of contract claim against Swan.

Similarly, to succeed on its breach of fiduciary duty claims against Swan and Whipple, AP must show conduct that amounts to breach. *See Miller v. Olsen*, No. 3:15-CV-00571, 2016 U.S. Dist. LEXIS 102272, at *16 (D. Or. Aug. 4, 2016). "An employee owes an employer a fiduciary duty; one aspect of this broad principle is that an employee must not actively compete with his employer during his employment." *Element Materials Tech. Food US LLC v. Kahl*, No. 3:19-CV-1491, 2020 U.S. Dist. LEXIS 27219, at *12 (D. Or. Feb. 18, 2020). AP claims Swan

7 – OPINION AND ORDER

and Whipple breached their fiduciary duties by participating in Reese's self-dealing insurance captive practice. Pl.'s Mot. TRO 41. As explained above, AP merely speculates that Swan and Whipple were engaged in self-dealing with Reese. Declarations from Reese, Swan, and Whipple all demonstrate that Swan and Whipple were unaware of Reese's practices regarding his side business and received no profits from the insurance captive clients. Because the current record reflects no evidence of breach by Swan or Whipple, AP's breach of fiduciary duty claims fail.

To prevail on a claim for trade-secret misappropriation under the Oregon Uniform Trade Secrets Act and Federal Defend Trade Secrets Act, a plaintiff must show "(1) the information was in fact a trade secret; (2) Plaintiff took reasonable measures to maintain the secrecy of information; and (3) Defendants' conduct constitutes misappropriation." *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-cv-01631, 2022 U.S. Dist. LEXIS 2804, at *11 (D. Or. Jan. 3, 2022). A "trade secret" is defined broadly to include all types of "financial, business, scientific, technical, economic, or engineering information" where the owner takes "reasonable measures to keep such information secret" and "the information derives independent economic value . . . from not being generally known." 18 U.S.C. § 1839(3). Specific examples can include "cost data, customer list, formula, pattern, compilation, program, device, method, technique or process." Or. Rev. Stat. § 646.461(4).

"Misappropriation" means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)–(B); Or. Rev. Stat. § 646.461(2). "Improper means" includes theft, bribery, misrepresentation, and breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6)(A); Or. Rev.

Stat. § 646.461(1). "In moving for a preliminary injunction, a plaintiff is not required to prove that misappropriation actually occurred, but merely that it likely occurred." *Bemis Co. v. Summers*, No. 2:19-cv-00344, 2019 U.S. Dist. LEXIS 32452, at *7 (E.D. Cal. Feb. 28, 2019). However, a plaintiff "must show the defendant acted with some degree of bad faith" and "specifically connect allegations of misappropriation to specific [d]efendants' actions." *Kinship Partners, Inc.*, 2022 U.S. Dist. LEXIS 2804, at *12–13.

AP argues Swan and Whipple misappropriated its trade secrets by accessing confidential client documents after their termination. Pl.'s Mot. TRO 39–40. The trade secrets at issue, AP contends, include client lists, presentation materials, renewal information, account and billing histories, and production reports. *Id.* at 37–38. As to Swan, AP's misappropriation claim fails for the same reasons as its breach of contract claim. AP has not demonstrated that Swan actually accessed trade secret information after his termination.

Additionally, although AP described some of the files Swan allegedly accessed, AP submitted none of the files for the Court's review. *See* Suppl. Decl. Hustrulid ¶ 16, ECF No. 60. Based on the current record, the Court is unable to assess whether the information Swan allegedly accessed constitutes trade secrets. And even assuming Swan did access AP's trade secrets, there is no evidence of misappropriation by Swan. He denies downloading or transferring the information AP alleges he accessed, and further states that he has not used confidential AP information to aid Whipple and Cobbs Allen. Swan Decl. ¶¶ 22–23, 28. Currently, AP offers nothing but conjecture to rebut Swan's denials or show that he misappropriated AP's trade secrets. AP's trade secret misappropriation claim against Swan therefore fails.

9 – OPINION AND ORDER

As to Whipple's acts of appropriation, AP alleges he accessed over thirty files of confidential client information that constitutes trade secrets. Specifically, Vaughn identified various PDFs, images, powerpoints, excel sheets, and folders that Whipple may have accessed on May 10 and May 13, 2022. Pl.'s Mot. TRO, Ex. 3, at ¶¶ 9–10. AP's evidence against Whipple suffers the same shortcomings as the evidence against Swan. Whipple provides explanations for nearly every file AP alleges he accessed, stating some files were likely left open on his laptop, some contain publicly available information, and some are unknown in content. Whipple Decl. ¶¶ 23–24, 27. And regardless of their content, Whipple further denies downloading or sharing these files. *Id.* ¶¶ 23–25, 27, 29. The Court is unable to evaluate whether these documents contain confidential or trade secret information. And even if they did, AP still does not demonstrate misappropriation by Whipple. AP claims Whipple is using its trade secrets to solicit clients and employees, yet concedes that Whipple is not bound by a Non-Solicitation provision. Pl.'s Mot. TRO 15, 36. That some AP clients have recently left AP for Cobbs Allen with Whipple as their broker, by itself, does not establish wrongdoing by Whipple. AP's trade secret misappropriation claim against Whipple therefore fails.

AP's trade secret misappropriation claims against Denson and Cobbs Allen necessarily fail based on the lack of evidence against Swan and Whipple. AP appears to argue that Denson and Cobbs Allen, as Swan and Whipple's new employers, knew or had reason to know that Swan and Whipple acquired AP's trade secrets by improper means. *See* 18 U.S.C. § 1839(5)(A)–(B); Or. Rev. Stat. § 646.461(2). As explained above, AP cannot demonstrate that Swan and Whipple acquired any trade secrets. Further, even if Swan and Whipple had acquired AP's trade secrets, nothing suggests that Denson or Cobbs Allen assisted them in doing so or later misused AP's trade secrets.

10 – OPINION AND ORDER

The evidence in support of the claims against Denson and Cobbs Allen is virtually nonexistent. AP refers to a conversation with Denson where he contacted AP about hiring Swan and Whipple and offered to buy part of AP's client book. Pl.'s TRO Mot. 21–22. AP also describes Denson's conversations with Holt, alleging Denson wrongfully solicited Holt. The Court fails to see how Denson's actions support a trade secret misappropriation claim. Swan and Whipple's subsequent employment with Cobbs Allen does not on its own establish that Cobbs Allen had access to or misused AP's trade secrets. Indeed, Denson stated that Cobbs Allen did not permit Swan or Whipple to begin working for Cobbs Allen until they returned their devices to AP and "had otherwise complied with their lawful obligations" to AP. Denson Decl. ¶ 19, ECF No. 52. Cobbs Allen "repeatedly informed and instructed [] Swan and [] Whipple that they must not use or disclose to anyone at [Cobbs Allen] any confidential or proprietary information belonging to [AP] or use any such information." *Id.* ¶ 20. AP failed to present any evidence showing trade secret misappropriation by Denson or Cobbs Allen.

Finally, as to the tortious interference claims, AP argues that Swan, Whipple, Denson, and Cobbs Allen's continued attempts "to steal AP's clients and employees is improper and illegal." Pl.'s Mot. TRO 43. AP further alleges Denson and Cobbs Allen are liable for their "continued pattern of encouraging the misappropriation of trade secrets and the use of such trade secrets to raid competitors' business." *Id.* To prevail on a tortious interference claim, a plaintiff must prove intentional interference with a professional or business relationship by a third party through improper means or for an improper purpose. *See AccentCare Home Health of Rogue Valley, LLC v. Bliss*, No. 1:16-cv-01393, 2017 U.S. Dist. LEXIS 88125, at *14 (D. Or. Apr. 13, 2017) (quoting *Cron v. Zimmer*, 296 P.3d 567, 575 (Or. Ct. App. 2013)). As explained above, the current record does not reflect breach of contract, breach of fiduciary duties, or trade secret

11 – OPINION AND ORDER

misappropriation by Swan or Whipple, nor is there evidence of improper purpose by any of the four Defendants. AP's claims for tortious interference therefore fail.

## II. Irreparable Harm

In addition to failing to demonstrate a likelihood of success on the merits, the Court is unconvinced that irreparable harm exists here. A plaintiff must establish that irreparable harm is likely rather than merely possible. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Economic damages, which may be remedied with a later judgment for monetary damages, do not constitute irreparable harm. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

AP's alleged irreparable harm includes loss of client revenue, as well as harm to client and employee relationships. While the Court recognizes that loss of client goodwill can cause irreparable harm, the Court disagrees with AP's contention that "[i]t is impossible to determine the full revenues AP would have generated but for the wrongful conduct." Pl.'s Mot. TRO 44. AP itself refers to dollar amounts it is losing as a result of Defendants' alleged misconduct. Pl.'s Mot. TRO 24, 26; Pl.'s Second Am. Verified Compl. ¶ 137. The value of client accounts and revenues are standard money damages that can be recouped upon a favorable judgment. *See L.A. Memm'l Coliseum Comm'n*, 634 F.2d at 1202. Additionally, the lack of evidence of breach or misappropriation by Defendants at this time further dissuades the Court from concluding that irreparable harm is likely.

## CONCLUSION

Because AP has not demonstrated a likelihood of success on the merits of its claims against Swan, Whipple, Denson, and Cobbs Allen nor a likelihood of irreparable harm, AP's Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 34, is DENIED.

IT IS SO ORDERED.

DATED this  17th  day of June, 2022.

                                                /s/ Michael McShane
                                                 **Michael J. McShane**
                                          **United States District Judge**

13 – OPINION AND ORDER