IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ASSUREDPARTNERS OF OREGON, LLC,
d/b/a ALLICANCE INSURANCE GROUP
& ALLIANCE SENIOR LIVING,                           Case No. 6:22-cv-00673-MC

      Plaintiff,                                   **OPINION AND ORDER**

      v.

G. SCOTT REESE, SUSAN REESE, CARL
SWAN, ALEX WHIPPLE, S&S
INVESTMENTS MANAGEMENT, LLC,
SHANNON R. HOLT, BRUCE DENSON,
JR., and COBBS ALLEN CAPITAL, LLC,
d/b/a CAC SPECIALTY,

      Defendants.
_____

**MCSHANE, District Judge:**

      Plaintiff AssuredPartners of Oregon, LLC ("AP"), an insurance brokerage firm, brings

this action against competitor Cobbs Allen Capital, LLC and its President, Bruce Denson, Jr.,[1]

for trade secret misappropriation, tortious interference, unjust enrichment, and civil conspiracy.

Pl.'s Second Am. Verified Compl., ECF No. 41 ("SAC"). Denson and Cobbs Allen (collectively,

"Defendants") move to dismiss for failure to state the claim under Fed. R. Civ. P. 12(b)(6).

Because Plaintiff failed to allege facts showing wrongdoing by Defendants, the Motion to

Dismiss (ECF No. 91) is GRANTED with leave to amend.

---

[1] Plaintiff also brings claims against several former employees that are outside the scope of this Opinion.

1 – OPINION AND ORDER

## BACKGROUND

Plaintiff's claims arise out of Denson's hiring of former AP employees, Carl Swan and Alex Whipple. Swan and Whipple were part of a team at AP working in the specialized senior living facility insurance market. SAC ¶ 38. Swan signed a restrictive covenant agreement with AP which contained confidentiality, non-solicitation, and non-interference provisions. SAC ¶¶ 48, 53, 55. Although Whipple was not bound by a non-solicitation agreement, Plaintiff alleges that he did have confidentiality restrictions. SAC ¶ 50–51.

In May of 2022, AP terminated Swan and Whipple based on the belief that they participated in a scheme to divert broker fees away from AP for personal gain. SAC ¶ 111. After receiving notice of their termination, Swan and Whipple allegedly undertook a calculated effort to steal AP's confidential and trade secret information about current and prospective AP clients. SAC ¶ 115.[2] "Armed with client information, Swan and Whipple then began to shop themselves to other brokerage firms, including Cobbs Allen." SAC ¶ 11. They also allegedly started soliciting AP employees to be ready to jump ship and join them wherever they landed. SAC ¶ 12.

Before hiring Swan and Whipple, Denson called AP to inquire about purchasing the former employees' books of business. SAC ¶ 15. AP refused and told Denson that "the former employees had valid post-employment obligations." SAC ¶ 15. By hiring Swan and Whipple, AP alleges that Denson and Cobbs Allen chose to interfere with Swan and Whipple's employment agreements "and steal the clients it could not buy, using AP trade secret and confidential information taken by Swan and Whipple." SAC ¶ 16. AP sent Denson a letter demanding that he

---

[2] For example, post termination, Whipple allegedly accessed an AP database where the confidential information of hundreds of prospects and clients were stored, as well as client-specific files including worksheets, histories, and a large compilation of confidential data on AP's current clients. *Id.* ¶ 116, 118, 119. Swan allegedly logged into AP's Equity Holder Portal and accessed strictly confidential information and documents, then accessed his personal email address and used a flash drive that he retained from his employment at AP. ¶ 120–21.

cease and desist from interfering "with the contractual and common law rights AP has with Swan, Whipple and its current employees and clients." SAC ¶ 131. The letter also informed Denson that Whipple "misappropriated AP's trade secrets and confidential information after he was terminated." SAC ¶ 131. "Cobbs Allen responded by launching its plan to steal AP employees and clients." SAC ¶ 20. For example, Plaintiff alleges that after Swan and Whipple's termination, a client formerly serviced by Whipple informed AP that their renewal "was dependent on whether AP brought Swan and Whipple back." SAC ¶ 130. At least two former AP clients have now transferred to Cobbs Allen, listing Whipple as their insurance broker. SAC ¶¶ 21, 137.

In addition to soliciting AP clients, Plaintiff also alleges that Denson and Cobbs Allen interfered with AP's business relationships by using Swan and Whipple to solicit two AP employees to join Cobbs Allen—Shannon Holt and Yvonne Wiltse. SAC ¶¶ 16, 133. Holt worked on a team with Swan and Whipple at AP, and her phone records revealed that she was in regular communication with both following their terminations. SAC ¶ 18, 38. And about three weeks after Swan and Whipple's termination, Swan's former AP account executive, Wiltse, resigned from AP with just two days' notice. SAC ¶ 132. When pressed, Wiltse said that she was going to Cobbs Allen. SAC ¶ 133. AP alleges that "the design [wa]s to recruit the entire team to make it more likely clients w[ould] transfer to Cobbs Allen" and that "Denson and Cobbs Allen hired the former employees for the purpose of gaining unlawful access to AP confidential information and trade secrets and to exploit the former employees' relationships with AP's clients." SAC ¶¶ 136, 201.

## STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

When considering a motion to dismiss, the Court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

Defendants argue that Plaintiff failed to state a claim for trade secret misappropriation, and that Plaintiff's remaining claims for tortious interference, unjust enrichment, and civil conspiracy are preempted. The Court first addresses Plaintiff's trade secret misappropriation claims followed by preemption of the remaining common law claims.

### I.    Trade Secret Misappropriation

The federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Oregon Uniform Trade Secrets Act ("OUTSA"), Or. Rev. Stat. § 646.461, et seq., each create a civil cause of action for the misappropriation of trade secrets. The plaintiff must allege that (1) the

information was in fact a trade secret; (2) the plaintiff took reasonable measures to maintain the secrecy of the information; and (3) the defendant's conduct constitutes misappropriation. *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 21-CV-01631, 2022 WL 72123, at *4 (D. Or. Jan. 3, 2022). A person misappropriates a trade secret when they acquire, use, or disclose a trade secret with knowledge or reason to know that the trade secret was obtained through improper means. 18 U.S.C. § 1839(5); Or. Rev. Stat. § 646.461(2). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." Or. Rev. Stat. § 646.461(1); 18 U.S.C. § 1839(6)(A).

> Where, as here, a plaintiff accuses a defendant of indirect misappropriation, *i.e.* the defendant obtains a plaintiff's trade secrets from someone other than plaintiff, the plaintiff must allege facts to show that the defendant knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it.

*Heller v. Cepia, L.L.C.*, No. C 11-01146, 2012 WL 13572, at *6 (N.D. Cal. Jan. 4, 2012) (internal quotation marks omitted). However, knowledge of an employee's misappropriation is not enough; the plaintiff must allege that each defendant "actually used," acquired, or disclosed the trade secret. *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 80 (N.D. Cal. 2020).[3] That is, "[t]he plaintiff must 'specifically connect allegations of misappropriation to specific [d]efendants' actions.'" *Kinship Partners*, 2022 WL 72123, at *5 (quoting *Physician's Surrogacy, Inc. v. German*, No. 17CV718, 2018 WL 638229, at *8 (S.D. Cal. Jan. 31, 2018)).

Here, Plaintiff alleges that it sent a cease and desist letter expressly informing "Cobbs Allen that, as part of its forensic analysis of Whipple's AP-issued computer, Whipple repeatedly

---

[3] Though *Heller* and *Navigation Holdings* each analyzed California's codification of the Uniform Trade Secrets Act, the Court finds the reasoning in these cases persuasive.

misappropriated AP's trade secrets and confidential information after he was terminated." SAC ¶ 131. But the Complaint falls short of pleading facts showing Denson or Cobbs Allen's actual use, acquisition, or disclosure of AP's trade secrets. Plaintiff merely relies on the overlap between the information allegedly misappropriated by Whipple and two former AP clients that are now serviced by Whipple at Cobbs Allen. Pl.'s Opp. Mot. Dismiss 8, ECF No. 101. Plaintiff itself was aware of this likely result, as a former client informed AP that their renewal "was dependent on whether AP brought Swan and Whipple back." SAC ¶ 130. The Complaint also alleges that Holt tried to warn AP that it would lose business if it chose not to bring back Swan and Whipple. SAC ¶ 17.

Plaintiff's claim, that Defendants decided to "steal the clients it could not buy, using AP trade secret and confidential information taken by Swan and Whipple to do so," is a legal conclusion unsupported by factual allegations in the Complaint. SAC ¶ 16. Cobbs Allen hired Whipple after AP terminated him, and he was not bound by a non-solicitation agreement. SAC ¶ 51. Under these circumstances, knowledge that Whipple may have misappropriated AP's trade secrets is not enough to inculpate Denson or Cobbs Allen of misappropriation. The Court is unwilling to equate hiring Whipple and Swan—after AP unilaterally terminated them—with acquiring or using AP's trade secrets. Because the Complaint contains no factual allegations of misappropriation by Denson or Cobbs Allen, the Motion to Dismiss these claims is granted with leave to amend.

## II.    **Common Law Claims**

Defendants argue that Plaintiff's remaining common law claims for tortious interference, unjust enrichment, and civil conspiracy are preempted by the OUTSA. The OUTSA "supersede[s] conflicting tort, restitution or other law of Oregon providing civil remedies for

misappropriation of a trade secret." Or. Rev. Stat. § 646.473(1). However, "[o]ther civil remedies that are not based upon misappropriation of a trade secret" are not preempted. *Id.* § 646.473(2)(b). "[T]he critical issue is crystal clear: 'Where the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of the [OUTSA]." *Alternative Legal Sols., Inc. v. Ferman Mgmt. Servs., Corp.*, No. CV-07-880, 2009 WL 10733692, at *13 (D. Or. May 5, 2009), *report and recommendation adopted,* No. CV 07-880-ST, 2009 WL 10733694 (D. Or. June 8, 2009). In other words, the common law claim is preempted by the OUTSA to the extent that it relies on "the same information and knowledge characterized by Plaintiffs as trade secrets[.]" *Acrymed, Inc. v. ConvaTec*, 317 F. Supp. 2d 1204, 1218 (D. Or. 2004).

      Using misappropriated trade secrets to solicit clients or employees from a competitor is "clearly encompassed" by the OUTSA's prohibition on the improper use of a trade secret "regardless of whether that information meets the statutory definition of a trade secret." *Vigilante.com, Inc. v. Argus Test.com, Inc.*, No. CV04-413, 2005 WL 2218405, at *13 (D. Or. Sept. 6, 2005); *Opal Labs Inc. v. Sprinklr, Inc.*, No. 3:18-CV-01192, 2021 WL 3713042, at *6 (D. Or. Aug. 19, 2021) (internal quotation marks and citation omitted). However, merely hiring a competitor's employee does not constitute misappropriation of a trade secret. *Alternative Legal Sols.*, 2009 WL 10733692, at *15 ("Thus, absent the allegation concerning the hiring of an individual which clearly does not constitute misappropriation of a trade secret, the claim may well be preempted.").

### A. Tortious Interference

      Plaintiff brings a claim for tortious interference with economic relations and a claim for

tortious interference with contractual relations.[4] Plaintiff alleges that Denson and Cobbs Allen tortiously interfered by (1) "hir[ing] former [AP] employees for the purpose of gaining unlawful access to AP['s] confidential information and trade secrets," (2) using misappropriated "confidential information to facilitate the transfer of clients away from AP," (3) "soliciting current employees in violation of valid agreements," and (4) "inducing the former employees to violate their agreements with AP." SAC ¶¶ 193, 201–02.

At the outset, Plaintiff's first two allegations are based on the alleged misappropriation of trade secrets and are therefore preempted by the OUTSA. The fact that Plaintiff labels the information "confidential" rather than "trade secret" is of no consequence where, as here, Plaintiff alleges no factual distinction between the two. *See Vigilante.com, Inc.*, 2005 WL 2218405, at *13. Plaintiff's remaining allegations pertain to the solicitation of AP employees, which are not preempted. *See Alternative Legal Sols.*, 2009 WL 10733692, at *15. Still, the Court finds Plaintiff failed to state a claim for tortious interference against Defendants.

Tortious interference with economic relations requires a plaintiff to allege (1) the existence of a valid business relationship or expectancy; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to economic relations; and (6) damages. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 891 P.2d 639, 646 (Or. 1995). Denson and Cobbs Allen challenge the fourth element of Plaintiff's tortious interference claims, improper means or purpose.

---

[4] In *McGanty v. Staudenraus*, 901 P.2d 841 (Or. 1995), the Oregon Supreme Court applied the same set of elements to both claims and further clarified that the first element, the existence of a valid business relationship or expectancy, could include professional relationships, contracts, or "prospective economic advantage." *Id.* at 844. Because of their close relation, the Court addresses the interference claims together.

To satisfy the improper means prong, the interference "must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Nw. Nat. Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124 (Or. 1999). "[I]f liability is based on an improper motive or purpose, then the purpose must be to inflict injury on the plaintiff as such." *Sharma v. Providence Health & Servs.-Or.*, 412 P.3d 202, 217 (Or. Ct. App. 2018) (cleaned up).

While "a business is permitted to hire talented employees from a competitor for the legitimate purpose of benefiting its own business, it is not entitled to do so if it knows those employees are contractually bound." *Insight Glob., LLC v. Tessar*, No. 18-CV-00368, 2019 WL 2488717, at *3 (D. Or. Mar. 20, 2019). That said, merely hiring a competitor's contractually bound employee is insufficient to allege acting with an improper purpose—the plaintiff must also allege facts demonstrating the competitor's affirmative inducement of the employee's breach. *See id.* at *3–4. For example, the plaintiff in *Insight* alleged facts showing that the competitor substantially encouraged and assisted the plaintiff's former employees in concealing the violation of their restrictive covenant agreements. *Id.* The court denied the motion to dismiss on the tortious interference claim, finding that the competitor's alleged direct involvement demonstrated inducement. *Id. See also Uptown Heights*, 891 P.2d at 649 (finding intentional interference claim adequately pleaded where the plaintiff alleged the defendant's "affirmative inducement" of third-party withdrawal from a business relation with the plaintiff "without justification").

Here, Plaintiff alleges that Defendants (1) "solicited current employees in violation of valid agreements," (2) "entered into a civil conspiracy to interfere with AP's business relations," (3) "aided and abetted each other in interfering with AP's business relations," (4) "instruct[ed] the

former employees to flagrantly violate" their contractual agreements, and (5) "acted with an improper motive and utilized improper means in inducing the former employees to violate their agreements with AP." SAC ¶¶ 193–95, 200, 202. A thorough exploration of the Complaint leaves the Court searching for factual allegations in support of these conclusions.

The Complaint is void of any allegations demonstrating misconduct by Denson or Cobbs Allen. There are no allegations of Defendants' direct solicitation and, as pleaded, the plausibility of Defendants' affirmative inducement of Swan and Whipple's solicitation is a stretch. Likewise, Plaintiff has not alleged facts showing that Defendants affirmatively induced current or former AP employees to violate their agreements with AP. For example, after AP terminated Swan and Whipple, Plaintiff alleges the two immediately began "shopping themselves to other firms . . . [and] soliciting AP's employees." SAC ¶ 12. If anything, AP's termination "induced" Swan and Whipple to act. Because merely hiring a contractually bound employee is insufficient to support a claim for tortious interference, the claims are dismissed with leave to amend.

### B. Unjust Enrichment

Plaintiff brings a claim for unjust enrichment arising out of Defendants' alleged (1) use of AP's confidential and trade secret information, (2) solicitation, interference, and transfer of AP's clients, and (3) solicitation of AP's employees. SAC ¶ 185. For the reasons discussed above, AP's unjust enrichment claim, as it relates to misappropriation of trade secret or confidential information, is preempted by the OUTSA. While the alleged solicitation of AP's clients and employees goes beyond the misappropriation of trade secrets, these remaining allegations fail to support an unjust enrichment claim.

For claims of unjust enrichment, courts conduct a case-by-case analysis, examining "established legal categories of unjust enrichment as reflected in Oregon case law and other

authorities to determine whether any particular enrichment is unjust." *Larisa's Home Care, LLC v. Nichols-Shields*, 404 P.3d 912, 921 (Or. 2017) (altering the analytic framework of an unjust enrichment claim under Oregon law).[5] The Restatement (Third) of Restitution and Unjust Enrichment (2011) is a proper authority to reference when considering whether allegations of unjust enrichment fall within an "established category". *See id.*

      Here, the established category of unjust enrichment, according to Plaintiff, is Denson and Cobbs Allen's "benefit by conscious interference with AP's legally protected interests," apparently falling under section 44 of the Restatement. Pl.'s Opp. 23; Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011). "Conscious interference with property rights of any kind, with contractual expectations, or with other interests to which the law of torts extends a similar protection, will support the claim in restitution described in [§ 44]." *Id.* cmt. b. Claims under § 44 "appl[y] generally to interference with contract or with prospective economic advantage, *to the extent that such interference is tortious* under applicable law." *Id.* (emphasis added).

      The Court has already concluded that Plaintiff insufficiently pleaded the tortious nature of Defendants' alleged interference. And so, the claim for unjust enrichment falls by the same sword. Because no facts in the Complaint show that Defendants' alleged conscious interference was tortious, Plaintiff fails to sufficiently state a claim for unjust enrichment. The claim is dismissed with leave to amend.

---

[5] Plaintiff cites to *Vigilante.com* for the proposition that a short plain statement of its unjust enrichment claim is sufficient to survive a motion to dismiss. Pl.'s Opp. 24. However, since the court decided *Vigilante.com*, nearly two decades ago, both the federal pleading standards and the Oregon analysis of unjust enrichment claims have changed. *See Twombly*, 550 U.S. at 570; *Larisa's Home Care, LLC*, 404 P.3d at 918–21.

### C. Civil Conspiracy

Plaintiff alleges that Defendants "participated in a scheme to solicit AP clients in violation of their agreements and through the use of AP confidential information and trade secrets." SAC ¶ 214. Once again, the allegations that relate to the use of AP's confidential information and trade secrets are preempted by the OUTSA, and what remains is insufficient to state a claim.

"A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." *Bonds v. Landers*, 566 P.2d 513, 516 (Or. 1977) (internal quotation marks and citations omitted). To state a claim for civil conspiracy, the plaintiff "must allege facts showing: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Yanney v. Koehler*, 935 P.2d 1235, 1238 (Or. Ct. App. 1997) (cleaned up). "The primary purpose of a conspiracy must be to cause injury to another." *Bonds*, 566 P.2d at 516.

Here, Plaintiff essentially alleges that, in an effort to make it more likely that AP clients would transfer to Cobbs Allen, Denson and Cobbs Allen conspired with Swan and Whipple to recruit Holt and Wiltse. SAC ¶ 136. This scheme was allegedly done "with the primary purpose of injuring AP's revenue and client relationships." SAC ¶ 216. However, as explained above, Plaintiff's allegations do not support a plausible inference that Defendants acted with an improper purpose or by improper means. This makes it difficult for the Court to conclude that Defendants committed a civil conspiracy to accomplish an unlawful purpose or act by an unlawful means. Nor does Plaintiff allege facts illustrating a meeting of the minds. Plaintiff's

allegations regarding the civil conspiracy are merely legal conclusions unsupported by facts in the Complaint. The claim is dismissed with leave to amend.

## **CONCLUSION**

For the above reasons, Defendants' Motion to Dismiss (ECF No. 91) is GRANTED with leave to amend.

DATED this 30th day of December, 2022.


_____/s/ Michael J. McShane_____

Michael J. McShane
United States District Judge