James M. Barrett, OSB No. 011991
james.barrett@ogletree.com
OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
The KOIN Center
222 SW Columbia Street, Suite 1500
Portland, Oregon 97201
Tel: (503) 552-2140
Fax: (503) 816-0598

Todd J. Kaiser, IN Atty No. 10846-49
todd.kaiser@ogletree.com
*Admitted Pro Hac Vice*
OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN  46204
Tel: (317) 916-2155
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **ASSUREDPARTNERS OF OREGON, LLC, d/b/a ALLIANCE INSURANCE GROUP & ALLIANCE SENIOR LIVING,**<br><br>Plaintiff,<br><br>v.<br><br>**G. SCOTT REESE,  SUSAN REESE, CARL SWAN, ALEX WHIPPLE, S&S INVESTMENTS MANAGEMENT, LLC, SHANNON R. HOLT, and COBBS ALLEN CAPITAL, LLC, d/b/a CAC SPECIALTY,**<br><br>Defendants. | Case No. 6:22-cv-00673-MC<br><br>**THIRD AMENDED COMPLAINT** |

Plaintiff, AssuredPartners of Oregon, LLC, doing business as Alliance Insurance Group and Alliance Senior Living ("**Plaintiff**" or "**AP**"), by and through its undersigned counsel, hereby brings this Third Amended Complaint for injunctive relief and money damages against Defendants G. Scott Reese ("**Scott**"), Susan Reese ("**Susan**"), Carl Swan ("**Swan**"), Alex Whipple ("**Whipple**"), Shannon R. Holt ("**Holt**"), S&S Investments Management, LLC ("**S&S**"), and Cobbs Allen Capital, LLC d/b/a CAC Specialty ("**CAC**").   All defendants are referred to collectively as "**Defendants,**" and the individual defendants Scott, Susan, Swan, Whipple, and Holt, are collectively referred to as the "**Individual Defendants.**"

<u>**JURISDICTION**</u>

1.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

<u>**PARTIES AND VENUE**</u>

2.     AP is an Oregon limited liability company with its principal place of business in Orlando, Florida, and an office in Eugene, Oregon.  AP is a wholly owned subsidiary of AssuredPartners Capital, Inc., a Delaware corporation with its principal place of business in Florida.

3.     Scott is an individual who, upon information and belief, is a resident of Oregon living in Eugene, Oregon.

4.     Susan is an individual who, upon information and belief, is a resident of Oregon living in Eugene, Oregon.

5.     Swan is an individual who, upon information and belief, is a resident of Arizona living in Phoenix, Arizona.

6.     Whipple is an individual who, upon information and belief, is a resident of Arizona living in Phoenix, Arizona.

7.     Holt is an individual who, upon information and belief, is a resident of Oregon living in West Linn, Oregon.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

8.      S&S is a Nevada limited liability company with its principal place of business in Eugene, Oregon.  Scott is listed as its member and also its registered agent.

9.      CAC is a Delaware limited liability company registered to do business in Oregon with its principal place of business located in Birmingham, Alabama.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2). Defendants Scott, Susan, and Holt reside in this judicial district, and a substantial part of the events and omissions giving rise to the claims in this lawsuit have occurred here.

## FACTUAL ALLEGATIONS

11.     AP is an insurance brokerage that provides insurance, employee benefits, and risk management services to clients in a variety of industries.  AP provides these services through the efforts of its producers, account executives, and support staff.

12.     The business of providing insurance services is highly competitive.  It is common for insurance brokerages to require their producers and other employees to enter into covenants to protect confidential and competitively sensitive information, including trade secrets, such as client requirements, rating information, and policy expiration and renewal dates.  It is also common for insurance brokerages to protect their investment in employee and client relationships and goodwill by, among other things, restricting employees from soliciting other employees or soliciting or transacting business with clients after separating from employment.

13.     To protect its customer relationships and confidential and competitively sensitive information, AP requires employees to sign a Restrictive Covenant Agreement ("RCA") as a condition of employment.

14.     With the exception of Whipple, each of the Individual Defendants signed an RCA as a condition of employment with AP.  True and correct copies of the RCAs executed by the Individual Defendants are attached as Exhibit 1 ("Scott RCA"); Exhibit 2 ("Susan RCA"); Exhibit 3 ("Swan RCA"); and Exhibit 4 ("Holt RCA").

15.     AP intended Whipple to sign an RCA as a condition of his employment, but this did not happen as a result of an administrative oversight.

16.     The terms of the RCAs impose similar obligations on Scott, Susan, Swan, and Holt. Those obligations include (a) limitations on use and disclosure of AP's confidential and competitively sensitive information, both during and after their employment with AP (Section 2 of the RCAs); and (b) limitations on the ability to solicit AP's employees or solicit or transact business with "Restricted Clients," as defined in the RCA, both during and after their employment with AP (Section 3 of the RCAs).

17.     AP takes further steps to protect trade secrets, confidential, and proprietary information by notifying employees in its Handbook of their duties with respect to "Trade Secret and Confidential Information."  Employees are required to acknowledge a duty not to "remove, copy, replicate, disseminate, forward (e.g., forward [AP's] emails to an employee's private email account) Trade Secret or Confidential Information, or partner, coordinate or cooperate with third parties to do the same."  A true and correct copy of the Trade Secrets and Confidential Information policy in AP's 2022 Handbook is attached as Exhibit 5.

18.     The Individual Defendants received and acknowledged AP's Handbook policies, including the Trade Secrets and Confidential Information policy.

19.     AP takes further steps to protect confidential and competitively sensitive information by notifying employees in its Handbook of their duties with respect to personal integrity and loyalty to AP.  Among other things, AP employees are required to acknowledge a duty of loyalty preventing them from taking corporate opportunities for themselves, i.e., "using corporate property, information or position for improper personal gain" and a duty to maintain the confidentiality of confidential information entrusted to them, both during employment and thereafter.  A true and correct copy of the Code of Conduct and Business Ethics policy in AP's 2022 Handbook is attached as Exhibit 6.

20.     The Individual Defendants each received and acknowledged AP's Handbook policies, including the Code of Conduct and Business Ethics policy.

21.     In consideration for and in reliance on the Individual Defendants' respective promises in their RCAs and their acknowledgments of their duties pursuant to the Trade Secrets

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

and Confidential Information policy and the Code of Conduct and Business Ethics, AP provided the Individual Defendants with (a) access to its trade secret and competitively sensitive information; and (b) other benefits, including compensation, promotion of their services, office space, administrative and billing support, insurance coverage, retirement savings, car allowances, and expense reimbursements.

**Allegations Concerning S&S**

22.     A "captive" is an insurance company that is wholly owned and controlled by its insured for the purpose of self-insuring the insured's risks.  In certain situations, AP uses captives on behalf of clients when a particular set of circumstances makes a captive the right vehicle to meet a client's needs.

23.     At all times relevant to the claims in the lawsuit, AP managed captives with the assistance of a third-party captive manager Strategic Risk Solutions ("SRS").

24.     Captives can require a substantial amount of work on AP's part.  As a result, in or about April 2022, AP asked SRS if it could update the arrangement with captives and ask captives to pay AP a fee and/or commission for the work AP performs on a captive's behalf.

25.     AP's inquiry to SRS resulted in a discovery that captives had already been asked to pay a fee for work that AP was doing on the captives' behalf and that the fee had been diverted to Scott and/or S&S, a company that was not registered with the Oregon Department of Insurance until January 31, 2022.  Specifically, AP discovered that Scott had moved the insurance lines of at least three clients and one prospective client into insurance captives managed by SRS and then directed SRS to pay "commissions" to Scott and/or S&S, instead of to AP.

26.     As one example of how commissions from captives were diverted, in December 2019, Scott sought to move a prospective client into an insurance captive.  When the captive manager set up a risk management fee to be directed to AP, Scott instructed that AP be cut out of the transaction.

27.     On information and belief, Whipple and Swan had knowledge of, facilitated, and failed to report Scott's diversion of fees to himself and/or S&S.  For example, when Scott

instructed the captive manager to divert a consulting fee from AP, he copied Whipple. Swan recruited prospects as candidates for captives that could generate fees for Scott.

28.     In July 2021, Swan directed that AP's commissions on other lines of insurance it had produced for the client outside of the captive be reduced so that Scott could continue to receive the full fee he had negotiated for himself via the captive and still meet the client's overall fee expectation. This would have had the effect of reducing Swan's compensation.

29.     On information and belief, the fees that Scott diverted to himself and/or SRS were also intended to benefit Whipple and Swan in addition to Scott for reasons not yet understood, and this benefit explains why Whipple and Swan abetted the conduct and why Swan, in at least one known instance described in the previous paragraph, allowed Scott's conduct to negatively impact his compensation.

30.     On information and belief, Susan, who was an Account Executive supporting Scott in providing services to AP clients and who is Scott's spouse, had knowledge of, facilitated, and/or failed to report Scott's diversion of fees to himself and/or S&S.

31.     On May 9, 2022, AP terminated the employment of Scott, Susan, Swan, and Whipple. The termination decision was based, in large part, on AP's discovery of Scott's diversion of fees to S&S and himself with the apparent aid and/or knowledge of Susan, Swan, and Whipple, which diversion violated Scott's, Susan's, and Swan's contractual promises under their respective RCAs, and violated all Individual Defendants' duties to AP as reflected in AP's Trade Secrets and Confidential Information policy and the Code of Conduct and Business Ethics.

32.     AP also based its termination decision on personnel complaints regarding Scott and his team, including complaints regarding Scott's behavior towards others and his failure to adhere to AP workplace policies, about which Scott had previously been counseled.

33.     AP has further discovered that, in addition to the scheme to divert fees, Scott and Susan submitted personal expenses to AP for reimbursement as business expenses, including, on information and belief, a personal trip to their daughter's graduation in Anchorage. This conduct reflected further breaches of Scott's and Susan's respective RCAs and violations of their duties to

AP as reflected in AP's Trade Secrets and Confidential Information policy and the Code of Conduct and Business Ethics.

34.     In August 2022, Scott, Susan, and S&S caused $785,498.03 to be deposited with the Court in connection with the scheme to steal fees from AP.

**Allegations Concerning CAC, Swan, Whipple, and Holt**

35.     Before AP terminated Swan's and Whipple's employment, both had been in regular contact with a principal of CAC, Bruce Denson, Jr. ("Denson"), about leaving AP to join CAC. These contacts were unknown to AP and had been occurring since at least early April 2022.

36.     Whipple and Swan are brothers-in-law related by marriage.  They have worked closely together for many years and have a history of making employment decisions jointly, with Whipple following the elder Swan's lead.  When Swan resigned from AP in 2015 to join a competitor, Propel Insurance, Whipple resigned too.  In 2017, when Swan resigned from Propel Insurance to work for AP again, Whipple rejoined AP.

37.     On information and belief, even if AP had not terminated Swan's and Whipple's employment based on their aid and/or knowledge of Scott's scheme to divert fees in connection with captive insureds, both had already decided to leave AP and had been planning to resign.

38.     CAC knew that AP used restrictive covenant agreements with its employees that limited employees' ability to transfer their existing books of business by, among other things, contractually prohibiting them from soliciting or transacting business with AP clients for a period of time after separation.  At one point, Swan told Denson that he had an employment agreement with AP with restrictive covenants that might impact him if he chose to leave.  In addition, once AP discovered CAC was soliciting its employees, AP notified CAC that is employees were subject to restrictive covenant agreements.

39.     CAC also uses restrictive covenant agreements with its employees, including Swan, Whipple, and Holt.  Like AP, CAC considers information about its clients to be confidential and competitively sensitive, and it limits its employees' ability to transfer existing books of business

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

to competitors by, among other things, contractually prohibiting them from soliciting or transacting business with CAC clients for a period of time after separation.

40.    With knowledge that AP uses restrictive covenants similar to the ones CAC uses, Denson contacted AP's President to ask whether AP would sell Swan's and Whipple's books of business to CAC.  Denson admitted to AP's President that, for CAC to justify Swan's and Whipple's salaries, Swan and Whipple would need some of their books of business at AP to follow them.  AP's President explained to Denson that it would not sell Swan's and Whipple's books of business to CAC.

41.    Undeterred, CAC pressed ahead with offers of employment to Swan and Whipple. With Swan's and Whipple's assistance, CAC also engaged in a concerted effort to recruit Holt and other AP employees, and, on information and belief, offered to pay Swan, Whipple, and Holt salaries at a level that assumed their books of business at AP would follow them to CAC.

42.    CAC engaged in this effort at an "employee lift-out" with knowledge that, excepting Whipple, AP's employees had agreed to restrictive covenants similar to the covenants CAC used with its own employees.  More specifically, CAC engaged in an effort to recruit AP employees who had supported the AP accounts serviced by Swan, Whipple, and Holt, with knowledge that (a) Holt and Swan were contractually prohibited from soliciting AP employees or transacting business with their former AP clients on CAC's behalf, either directly, or indirectly using Whipple or other CAC employees acting as their proxies; and (b) the employees who had supported Holt, Swan, and Whipple at AP were also contractually prohibited from soliciting or transacting business with AP clients on CAC's behalf, either directly or through other employees acting as their proxies.

43.    As an inducement to Swan, Whipple, and Holt to participate in its concerted effort to recruit AP employees and accounts without regard to duties or promises to AP, CAC offered to jointly and severally indemnify, defend, and hold them harmless from any liability, loss, or damages relating to any act, error, or omission as a CAC employee, and specifically with respect to any liability, loss, or damages relating to their "employment by, and departure from [AP],"

including but not limited to "allegations of violating any employment, confidentiality, non-solicitation, non-competition and/or non-disclosure agreements" with AP.  Notably, CAC did not condition its offers of indemnity and defense on Holt's, Swan's, or Whipple's successful defense of a claim by AP.  In other words, it did not matter to CAC whether Holt, Swan, or Whipple were adjudged to have violated a law or obligation with respect to AP.  No undertaking to repay CAC was required in such an instance.  CAC promised to indemnify, defend, and hold them harmless regardless.

44.    CAC's efforts to engineer an employee lift-out spanned from at least May 9, 2022, when AP terminated Scott, Susan, Whipple, and Swan, through June 9, 2022, the date Holt started her employment at CAC.

45.    On May 12, 23, 24, 25, 26, and 27, 2022, Whipple had a series of phone calls with Holt and, on information and belief, solicited her to join CAC, and did so knowing, or with a reasonable basis to know, that Holt was contractually prohibited from soliciting or servicing AP's clients on behalf of CAC.

46.    On May 11 and again on May 18, 2022, the day Swan received a draft offer of employment from CAC, Swan had calls with Holt and, on information and belief, solicited her to join CAC in violation of the promises he made to CAC in the Swan RCA and knowing, or with a reasonable basis to know, that Holt was contractually prohibited from soliciting or servicing AP's clients on behalf of CAC.

47.    On May 25, 2022, CAC formally offered Swan and Whipple employment consistent with terms that had been shared in draft form the previous week.  The same day, Denson called Holt and, on information and belief, solicited her to join CAC knowing, or with a reasonable basis to know, that Holt was contractually prohibited from soliciting or servicing AP's clients on behalf of CAC.

48.    Two days later, on May 27, 2022, a Friday, Holt appears to have deleted 105 files from her AP computer, most of which were photos.  On information and belief, Holt engaged in

mass deletions of these files because, at least as of this date, she had decided she would leave AP to join CAC.

49.     On May 29, 2022, the Sunday before Memorial Day, Whipple texted Holt that he was using a "temp" phone number that they could use to communicate.  Later that evening, Denson texted Holt, "Do you have 5 min to catch up today?"  Denson then called Holt and spoke to her for nearly seven minutes.

50.     On May 30, 2022, Memorial Day, CAC sent Holt an offer of employment.  Denson texted Holt to alert her that CAC had "[j]ust sent a draft offer" and to ask her "[w]hat works to speak tomorrow?"

51.     On May 31, 2022, Swan and Whipple officially started their employment with CAC.  The same day, Holt took a call from the cell phone of Swan's wife.  On information and belief, Swan solicited Holt to accept CAC's offer of employment or Holt confirmed that she had decided to join CAC.

52.     On June 1, 2022, Denson called Holt again and, on information and belief, Denson solicited her to accept CAC's offer of employment and/or Holt confirmed that she had already decided to accept CAC's offer.

53.     Also on June 1, 2022, Holt received a text message from an AP client representative "MH."  MH asked Holt whether she had "[a]ny updates??"  Holt replied, "no, still need some information on the new acquisitions.  Will reach out with what is needed."  In response, MH clarified:  "I meant with you????  You told me to hold tight last week and wait to hear from you."  Phone records show that Holt had spoken with MH the previous week, on May 25, 2022, the same day CAC made formal offers of employment to Swan and Whipple and Denson had called Holt.  On information and belief, on or about May 25, 2022, Holt had shared with MH her plans to leave AP and to accept CAC's offer of employment.

54.     On May 31, June 1, and June 2, 2022, Holt accessed confidential and competitively sensitive information regarding AP clients, including a WC Quote Summary, presentations, policy numbers, and historical loss runs.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

55.    On June 2, 2022, Holt contacted "DM," the CEO of a large AP client, "ISL" and exchanged 13 text messages with DM.  On information and belief, Holt shared with DM her plans to leave AP and accept CAC's offer of employment.  After texting DM, Holt spoke again with Denson at CAC and then called a number associated with Swan's and Whipple's attorney.  Later that evening, Holt exchanged seven text messages with Denson, including a text exchange in which Holt assured Denson that she would be "very comfortable" working on the workers' compensation account of a client who Denson was meeting with that evening.  Denson replied "Eggggselekent," explaining that the account "had a $3m premium and is just a total mess apparently."  Holt assured Denson "the messier the better."  Denson replied with a "smile" emoji and wrote:  "That's called opportunity!"  At this point Holt was still an AP employee.  But she was collaborating with Denson in offering her services to prospects on CAC's behalf and, on information and belief, had already decided to accept, or had accepted, CAC's offer of employment and was CAC's de facto agent.

56.    On June 3, 2022, having discovered that Holt was repeatedly communicating with Denson at CAC as well as with Swan and Whipple and Swan's and Whipple's attorney, AP terminated Holt's employment, assuming that her resignation was imminent.  At the time, AP did not know that Holt had already received, and possibly already accepted, an offer of employment from CAC.

57.    On June 9, 2022, Holt signed CAC's offer of employment.

58.    On information and belief, even if AP had not terminated Holt's employment on June 3, 2022, she had already decided to leave AP to join CAC and had planned to resign.

59.    CAC's effort at an employee lift-out extended beyond Swan, Whipple, and Holt.  CAC made a series of attempts to contact and, on information and belief, to solicit other AP employees who had supported Swan, Whipple, and Holt at AP in servicing AP's clients.  On information and belief, CAC was directed in these targeted efforts by Swan, Whipple, and/or Holt, who shared with CAC who had supported them in servicing AP's clients.  At times Whipple was used as a proxy in these solicitations, apparently under a theory that he owed no duties to AP because he had not signed an RCA.  All the employees contacted by CAC and its proxies were

subject to restrictive covenants that would limit their ability to transact business with AP clients as CAC employees, similar to the limitations that CAC imposes on its own employees, and CAC knew or had reason to know it.    Examples of CAC's employee lift-out efforts include the following:

(a)    On May 20 and 22, 2022, Denson contacted employee "L" via LinkedIn. Employee L is an AP Account Executive who had assisted Swan and, to a lesser extent, Whipple, in servicing AP clients.  Employee L entered into an RCA as a condition of employment with AP that restricted her ability to solicit or transact business with AP's clients for a period of two years following the end of her employment with AP.

(b)    Denson contacted employee "H" LinkedIn.  Employee H had provided key day-to-day support to AP clients serviced by Swan.  Employee H entered into an RCA as a condition of employment with AP that restricted his ability to solicit or transact business with AP's clients for a period of two years following the end of his employment with AP.

(c)    On May 9, 2022, and on several occasions thereafter, Whipple contacted Employee "J," who primarily supported AP clients serviced by Swan.  Employee J entered into an RCA as a condition of employment with AP that restricted her ability to solicit or transact business with AP's clients for a period of two years following the end of her employment with AP.

(d)    On June 1, 2022, AP employee Yvonne Wiltse ("Wiltse") tendered her resignation and accepted employment at CAC.  Wiltse was an AP Account Executive who had worked closely with Swan and the AP clients that Swan Serviced.  Wiltse entered into an RCA as a condition of employment with AP that restricted her ability to solicit or transact business with AP's clients for a period of two years following the end of her employment with AP.   On information and belief, Swan solicited Wiltse to join CAC directly or through Whipple or Denson as his proxy.

60.    On information and belief, Whipple and Swan use, or have used, temporary phones, sometimes referred to as "burner" phones, to shield their activities vis-à-vis AP's clients from detection.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

<u>**Swan's and Whipple's Unauthorized Access of Information**</u>

61.    Apart from CAC's employee lift-out scheme, Swan and Whipple engaged in several instances of unauthorized access of AP information after their separation from AP.

62.    On May 9, 2022, AP notified Scott, Susan, Swan, and Whipple that their access to AP's systems and accounts had been disabled, that they were prohibited from trying to access AP's systems and accounts, and that they were to return their AP-issued equipment immediately.

63.    Swan and Whipple did not return any devices to AP until May 14, 2022, and only returned some, not all, of the devices they possessed.  As detailed below, both ignored AP's directive not to access AP information.

64.    Swan did not return one of the AP-issued laptops that was in his possession until May 31, 2022, after he had accepted employment at CAC and started working there.

65.    AP hired a third-party to perform a forensic analysis of the devices returned by Whipple and Swan.  A forensic analysis revealed the following instances of unauthorized access of AP information by Whipple:

(a)    On May 9, 2022, after being notified of his termination from AP, Whipple accessed information about the prospects he developed on behalf of AP.  He used his AP-issued Dell laptop, and signed into Zoom, from which files and information may be shown, shared, and transferred. Two minutes later, Whipple accessed AP's client-relations-management ("CRM") tool, Freshsales, a database that Whipple and his team members used to house hundreds of prospects' (and prospects-turned-clients') confidential information and to take notes on the steps taken and results obtained in procuring new business. Whipple browsed Freshsales's functions related to settings, personal settings, account settings, subscription, email settings, and other settings. In these functions, Whipple, had he chosen to do so, could edit his details, email signature, and enable or disable email tracking.

(b)    Upon information and belief, and potentially after disabling email tracking, Whipple continued to access AP's CRM from May 9, 2022, until May 16, 2022, when AP was

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

finally able to shut off Whipple's access.  Even then, Whipple called Freshsales's help desk and left a voicemail to open a service ticket.

(c)      On May 10, 2022, Whipple accessed client-specific files locally saved on his OneDrive and downloads folder, including but not limited to a file that consisted of a compilation of competitively sensitive information that AP considers confidential and trade secret because it includes an aggregation of client names, policy terms, carriers, coverages, results related to efforts with carriers, and confidential comments regarding efforts related to carriers.  Overall, 30 files were accessed from the AP-issued Dell laptop OneDrive folder on May 10, 2022.

(d)      On May 13, 2022, Whipple used the AP-issued Dell laptop to access two folders pertaining to a client in which he shared a close relationship.  Whipple also accessed four files from the Dell laptop OneDrive folder.  Whipple also accessed files from the AP-issued Dell laptop downloads folder, including a Zoom file and other files that included a large compilation of confidential data that would be extremely valuable to a competitor.  For example, one file accessed by Whipple consisted of a compilation of competitively sensitive information regarding a specific client that AP considered confidential and trade secret, including policy renewal date, loss graph summary (including lines of business, policy dates, carriers, valuation dates, payments, reserves, deductibles, premiums, carrier loss ratios, and claims), premium summaries, key discussions regarding the client's coverages, and captive analyses, as well as AP's analyses of the global state of the market, the senior living segment of the market, market trends, rate trends and expectations, and coverage trends.  Whipple concluded his activity by browsing to his iCloud mailbox.

66.      A forensic analysis revealed the following instances of unauthorized access of AP information by Swan:

(a)      On May 12, 2022, Swan used his AP-issued MacBook computer and visited AP's Equity Holder Portal.  AP's Equity Holder Portal states that login is required to access the application, and that, "All information and documents available through this portal are STRICTLY CONFIDENTIAL and are subject to the confidentiality provisions of any employment,

confidentiality, restrictive covenants or similar agreement you have signed with any direct or indirect subsidiary of The AssuredPartners Group LP." Two minutes later, Swan signed into a personal email address, carlswan@comcast.net, and spent the next 21 minutes within his personal email's inbox and sent items.

       (b)     On May 13, 2022, Swan used a flash drive (the "Swan Flash Drive") he had retained from his employment at AP and accessed two files. One file included a compilation of competitively sensitive information regarding a specific client that AP considered confidential and trade secret, including client properties, business income, total insured values, analyses of rate trends and expectations, and market trends. The other file was a production report in Excel format that compiled a large amount of competitively sensitive information about AP's clients that AP considers confidential and trade secret, including but not limited to the clients' names, policy numbers, transaction codes, departments, accounting months, policy and line types, bill modes, effective dates, premium payable codes, premium payable names, transaction amounts, agency commission amounts, agency commission percentages, commission percentages, commission amounts, and producer information. In total, the production report included 5,083 rows of information relating to 192 AP clients produced by Reese, Swan, and Whipple that generated $13 million in annual revenue.

       67.     On information and belief, Swan and Whipple acquired AP's information after accessing it without authority, whether by transferring the information electronically, by hand, or by memory, and did so with the intent to steal the information and use it to benefit themselves in their prospective employment with CAC.

**AP's Lost Clients**

       68.     Since CAC's effort at an employee lift-out that netted them Swan, Whipple, Holt, Wiltse and two other AP employees, AP has lost 14 clients to CAC, accounting for more than $1,659,016 in annual revenue. Clients serviced by Swan, Whipple, and/or Holt who have moved from AP to CAC include the following:

Page 15 -    THIRD AMENDED COMPLAINT

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503-552-2140 | Fax: 503-224-4518

| No. | Client | Broker of Record (BOR) change sent or rec'd | Est. Lost Revenue |
|---|---|---|---|
| 1. | IHC | 06/03/2022 | $181,397 |
| 2. | RH | 06/03/2022 | $57,190 |
| 3. | OSL | 06/03/2022 | $150,000 |
| 4. | CHG | 06/06/2022 | $102,812 |
| 5. | MH | 06/22/2022 | $26,871 |
| 6. | RMC | 07/12/2022 | $76,456 |
| 7. | KH | 07/29/2022 | $237,181 |
| 8. | LHM | 08/05/2022 | $136,839 |
| 9. | EHG | 09/08/2022 | $50,000 |
| 10. | ISL | 09/09/2022 | $137,256 |
| 11. | CR | 09/28/2022 | $220,317 |
| 12. | FSL | 11/29/2022 | $58,285 |
| 13. | BL | 01/09/2023 | $195,285 |
| 14. | DMC | 01/27/2023 | $19,127 |
| | | | Total: $1,649,016 |

69.    Client No. 1:    A compilation of confidential and competitively sensitive information regarding IHC that AP considered trade secret, including the amount of commissions paid by IHC and IHC's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP information.

70.    Client No. 2:    A compilation of confidential and competitively sensitive information regarding RH that AP considered trade secret, including the amount of commissions paid by RH and RH's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.

71.    Client No. 3:    Whipple accessed an AP file that included information about OSL on May 10, 2022, after AP terminated his employment, instructed him to return AP information, and expressly prohibited him from accessing AP files.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

72.     <u>Client No. 4</u>:    A compilation of confidential and competitively sensitive information regarding CHG that AP considered trade secret, including a presentation to CHG that was dated for the following week, June 8, 2022, and a detailed compilation of CHG's historical claims and actual and expected losses, was included in the files Holt accessed on May 31, 2022, the day after she received an offer of employment at CAC and two days before she assured Denson that she could support business on CAC's behalf.

73.     <u>Client No. 5</u>:    A compilation of confidential and competitively sensitive information regarding MH that AP considered trade secret, including the amount of commissions paid by MH and MH's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files

74.     <u>Client No. 6</u>:    A compilation of confidential and competitively sensitive information regarding RMC that AP considered trade secret, including the amount of commissions paid by RMC and RMC's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.

75.     <u>Client No. 7</u>:    A compilation of confidential and competitively sensitive information regarding KH that AP considered trade secret, including the amount of commissions paid by KH and KH's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.  In addition, on May 27, 2022, the date Holt deleted AP files en masse and, on information and belief, had decided to join CAC, Holt accessed and subsequently deleted an analysis of performance and outcomes for KH.

76.     <u>Client No. 8</u>:    A compilation of confidential and competitively sensitive information regarding LHM that AP considered trade secret, including the amount of commissions paid by LHM and LHM's policy numbers and effective dates, was included on the production

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files..

77.    <u>Client No. 9</u>:  At the time of Swan's separation, EHG was a new AP client that Swan and others at AP had been servicing.  A month after AP had bound coverage for EHG, the client issued a BOR in favor of CAC.

78.    <u>Client No. 10</u>.    A compilation of confidential and competitively sensitive information regarding ISL that AP considered trade secret, including the amount of commissions paid by ISL and ISL's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.  In addition, as noted above, on June 2, 2022, Holt was in communication with the CEO of ISL after she received an offer of employment from CAC and had supported CAC's efforts to solicit business on her behalf as a prospective CAC employee.

79.    <u>Client No. 11</u>:  On May 13, 2022, four days after AP terminated Swan's employment, instructed him to return all AP information, and prohibited him from accessing AP files, Swan accessed an AP flash drive to access a PowerPoint regarding CR.  He also accessed a compilation of confidential and competitively sensitive information regarding CR that AP considered trade secret, including the amount of commissions paid by CR and CR's policy numbers and effective dates.

80.    <u>Client No. 12</u>:  Whipple accessed a file on FSL saved on his OneDrive and downloads folder on May 10, 2022, one day after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.  On May 27, 2022, the date Holt deleted AP files en masse and, on information and belief, had decided to join CAC, Holt accessed a client workbook for FSL and accessed the workbook a second time on June 2, 2022, after she had received a job offer from CAC and had supported CAC's efforts to solicit business on her behalf as a prospective CAC employee.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

81.    <u>Client No. 13</u>: A compilation of confidential and competitively sensitive information regarding BL that AP considered trade secret, including the amount of commissions paid by BL and BL's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.  Holt accessed a copy of BL policy numbers on June 1, 2022, after she had received a job offer from CAC and had supported CAC's efforts to solicit business on her behalf as a prospective CAC employee.

82.    <u>Client No. 14</u>:  A compilation of confidential and competitively sensitive information regarding KH that AP considered trade secret, including the amount of commissions paid by KH and KH's policy numbers and effective dates, was included on the production report accessed by Swan on May 13, 2022, four days after AP terminated his employment, instructed him to return all AP information, and prohibited him from accessing AP files.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment – 28 U.S.C. § 2201**
**(Against Scott, Susan, Swan, Holt)**

83.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

**Count (1)**

84.    On May 13, 2022, Swan repudiated the enforceability of the Swan RCA.

85.    An actual, justiciable controversy exists between AP and Swan with respect to the enforceability of all provisions of the Swan RCA that apply post-separation.

86.    AP is entitled to a declaratory judgment that the restrictive covenants in the Swan RCA are valid and enforceable, in whole or in part, including the restrictive covenants in Section 2 and Section 3.

87.    AP is entitled to injunctive relief in the form of an order directing Swan to comply with his promises under the Swan RCA and prohibiting further breaches thereof.

88.    AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 18 of the Swan RCA.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

## Count (2)

89.     On June 15, 2022, Holt repudiated the enforceability of the Holt RCA.

90.     An actual, justiciable controversy exists between AP and Holt with respect to the enforceability of all provisions of the Holt RCA that apply post-separation.

91.     AP is entitled to a declaratory judgment that the restrictive covenants in the Holt RCA are valid and enforceable, in whole or in part, including the restrictive covenants in Section 2 and Section 3.

92.     AP is entitled to injunctive relief in the form of an order directing Holt to comply with her promises under the Holt RCA and prohibiting further breaches thereof.

93.     AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 16 of the Holt RCA.

## Count (3)

94.     On January 9, 2023, Scott and Susan repudiated the enforceability of their respective RCAs.

95.     An actual, justiciable controversy exists between AP, on the one hand, and Scott and Susan, on the other hand, with respect to the enforceability of covenants in their respective RCAs that apply post-separation.

96.     AP is entitled to a declaratory judgment that the restrictive covenants in the Scott RCA and Susan RCA are valid and enforceable, in whole or in part, including the restrictive covenants in Sections 2 and Section 3.

97.     AP is entitled to injunctive relief in the form of an order directing Scott and Susan to comply with her promises under the Scott RCA and Susan RCA and prohibiting further breaches thereof.

98.     AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 16 of the Scott RCA and Paragraph 18 of the Susan RCA.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

## SECOND CLAIM FOR RELIEF
### Breach of Contract
### (Against Scott, Susan, Swan, and Holt)

99.      AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

100.     AP has fully performed all obligations under the Scott RCA, Susan RCA, Swan RCA, and Holt RCA.

### Count (1)
### (Against Scott and Susan)

101.     Scott breached Sections 1.3, 2.2, 3.1.1, and 3.1.2 of the Scott RCA, and Susan breached Sections 2.2, 3.1.1, and 3.1.2 of the Susan RCA by using AP's "Confidential Information" (as defined therein) to usurp corporate opportunities and divert fees from AP clients and prospective clients to Scott and/or S&S.

102.     AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of the Scott RCA and Susan RCA in an amount to be proven at trial.

103.     AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 16 of the Scott RCA and Paragraph 18 of the Susan RCA.

### Count (2)
### (Against Swan)

104.     Swan breached Section 2(b) of the Swan RCA by accessing, failing to return, and using AP's "Confidential Information" (as defined therein) for the benefit of himself and third parties.  This use was both direct and indirect, using Whipple as Swan's proxy.

105.     Swan breached Sections 3(a)(i) and 3(a)(ii) of the Swan RCA as an AP employee by aiding and abetting Scott in diverting fees from AP clients and prospective clients to Scott and/or S&S.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

106.    Swan breached Section 3(a)(i) by soliciting and transacting business with AP clients for the benefit of CAC, whether directly or indirectly through Whipple as Swan's proxy, including IHC, OSL, RHC, R, and MSLH.

107.    Swan breached Section 3(a)(iii) by soliciting AP employees, including Holt and, on information and belief, Wiltse, to leave CAC.

108.    AP is entitled to injunctive relief in the form of an order directing Swan to comply with his promises under the Swan RCA and prohibiting further breaches thereof.

109.    AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of the Swan RCA in an amount to be proven at trial.

110.    AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 18 of the Swan RCA.

**Count (3)**
**(Against Holt)**

111.    Holt breached Sections 1.3 and 2.2 of the Holt RCA by accessing and using AP's "Confidential Information" (as defined therein) for the benefit of herself and third parties.

112.    Holt breached Section 1.3 of the Holt RCA as a current employee by aiding CAC in its effort to compete against AP for business.

113.    Holt breached Sections 3.1.1 and 3.2.2 of the Holt RCA as a current employee by advising AP client contacts of her plans to change employers with the purpose of having clients cease doing business with AP, including AP client contacts MH and DM.

114.    Holt breached Section 3.1.1 of the Holt RCA by soliciting and transacting business with an AP client for the benefit of CAC, specifically AP client CHG.

115.    AP is entitled to injunctive relief in the form of an order directing Holt to comply with her promises under the Holt RCA and prohibiting further breaches thereof.

116.    AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of the Holt RCA in an amount to be proven at trial.

117.    AP is entitled to an award of its reasonable attorneys' fees and costs pursuant to Paragraph 16 of the Holt RCA.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duties**
**(Against All Defendants)**

118.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

119.    The Individual Defendants owed and continue to owe AP fiduciary duties of loyalty and care as former agents and employees of AP.  These duties include a duty to avoid self-dealing and the usurpation of corporate opportunities and a duty to safeguard and not use for the benefit of themselves or others AP's confidential or competitively sensitive information.

120.    AP's confidential and competitively sensitive information includes information it considers trade secret information.  To the extent information does not meet the definition of trade secret under applicable law, AP asserts, in the alternative, that the information remains confidential and competitively sensitive.  The Individual Defendants owed and continue to owe AP a duty to safeguard, and not use for the benefit of themselves or others AP's confidential and competitively sensitive information, whether or not the information rises to the level of trade secret as defined by applicable law.

121.    S&S and CAC knew, or had reason to know, that the Individual Defendants owed, and continue to owe, fiduciary duties to AP with respect to the confidentiality and use of confidential and competitively sensitive information entrusted to their care.

### Count (1)
**(Against Scott, Susan, Whipple, Swan and S&S)**

122.    By diverting fees from AP clients and prospective clients to himself and/or S&S, Scott breached his fiduciary duties to AP.

123.    Scott, Susan, Whipple, Swan and S&S entered into a civil conspiracy to breach Scott's fiduciary duties to AP as part of a common plan or design.

124.    Scott, Susan, Whipple, Swan and S&S aided and abetted Scott in breaching Scott's fiduciary duties to AP.

125.    S&S is liable for Scott's breaches of his fiduciary duty under the doctrine of respondeat superior.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

126. S&S is controlled by Scott and is liable for Scott's breaches of his fiduciary duty as Scott's alter ego.

127. Susan, Whipple, and Swan breached their fiduciary duties by their acts and omissions by aiding or failing to report Scott's diversion of fees from AP clients to himself and/or S&S.

128. AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of fiduciary duties. Known damages currently exceed $750,000.

## Count (2)
### (Against Scott and Susan)

129. By submitting personal expenses as business expenses to AP for reimbursement, Scott and Susan breached their fiduciary duties to AP.

130. Scott and Susan entered into a civil conspiracy to breach their fiduciary duties to AP as part of a common plan or design.

131. Scott and Susan aided and abetted each other in breaching their fiduciary duties to AP.

132. AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of fiduciary duties in an amount to be proven at trial.

## Count (3)
### (Against Holt and CAC)

133. Holt decided to join CAC while still employed at AP. While still employed at AP, Holt breached her fiduciary duties to AP by (a) disclosing to AP clients that she intended to leave AP and instructing them to stand by until she was at her new employer, with the intent that her clients transfer their business; (b) providing material assistance to CAC in soliciting business opportunities on her behalf as a future CAC employee; and (c) accessing AP's confidential and competitively sensitive information about her AP clients for the purpose of using that information to benefit herself and her future employer, CAC.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503-552-2140 | Fax: 503-224-4518

134.    As a former AP employee, Holt breached her fiduciary duties by using AP confidential and competitively sensitive information about her AP clients to secure business on behalf of CAC, including AP client CHG.

135.    Holt and CAC, through its agent, Denson, entered into a civil conspiracy to breach Holt's fiduciary duties to AP as part of a common plan or design.

136.    CAC, through its agent, Denson, aided and abetted Holt in breaching Holt's fiduciary duties to AP.

137.    CAC induced Holt to breach her fiduciary duties to AP by promising to indemnify, defend, and hold her harmless from any such breach.

138.    CAC is liable for Holt's breaches of her fiduciary duty to AP under the doctrine of respondeat superior.  This includes Holt's breaches of her fiduciary duties while still nominally an employee of AP but aiding CAC as its de facto agent in its effort to compete against AP for business.

139.    AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of fiduciary duties in an amount to be proven at trial.

### Count (4)
### (Against Whipple, Swan, and CAC)

140.    Whipple and Swan made plans to join CAC while still employed at AP.  After AP preemptively separated Whipple and Swan in connection with AP's discovery of Scott's scheme to divert fees from AP's clients to himself and/or S&S, Whipple and Swan breached their fiduciary duties to AP by (a) accessing AP confidential and competitively sensitive information about their AP clients for the purpose of using that information to benefit themselves and their future employer, CAC; and (b) trading on their knowledge of AP's clients, operations, and staffing to solicit Holt, Wiltse, and other AP employees to join CAC as part of CAC's effort at an employee lift-out.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

141.    Swan and Whipple further breached their fiduciary duties by using AP confidential and competitively sensitive information about AP clients to secure business on behalf of CAC, including AP clients IHC, OSL, RHC, R, and MSLH.

142.    Swan, Whipple, and CAC entered into a civil conspiracy to breach Swan's and Whipple's fiduciary duties to AP as part of a common plan or design to engineer an employee lift-out.

143.    CAC, Swan, and Whipple, have aided and abetted each other in breaching Swan's and Whipple's fiduciary duties to AP as part of CAC's effort to engineer an employee lift-out.

144.    Whipple has aided and abetted Swan in breaching Swan's fiduciary duties by acting as Swan's proxy.

145.    CAC induced Swan and Whipple to breach their fiduciary duties to AP, and to aid and abet each other in doing so, by promising to indemnify, defend, and hold them harmless from any such breach.

146.    CAC is liable for Swan's and Whipple's breaches of their fiduciary duties to AP under the doctrine of respondeat superior.

147.    AP is entitled to an award of actual damages, injunctive relief, a disgorgement of profits resulting from the breaches of fiduciary duties in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.)
### (Against Whipple, Swan, Holt and CAC)

148.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

149.    AP's possesses confidential and competitively sensitive information that, in many instances, rises to the level of trade secret.

150.    AP takes reasonable measures to protect information that it considers trade secret.

151.    AP's trade secrets include information used in interstate commerce to provide insurance services to clients with operations across the United States.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

152.    In their positions as producers, Swan, Whipple, and Holt had access to, and acquired knowledge of, some of AP's trade secrets, including trade secrets relating to AP's customer preferences, policies, policy renewal dates, and revenues.

153.    CAC, Whipple, Swan, and Holt each knew or had reason to know what information AP considered its trade secrets. Both Whipple and Swan promised CAC that they would keep CAC's similar information confidential as a condition of working for CAC.

154.    In 2015, Whipple and Swan previously misappropriated AP's trade secrets before resigning from AP, including AP's entire database of client and lead information and the contents of Swan's Outlook database. This information also appeared to have been copied to Whipple's personal computer. Swan, Whipple, and their new employer at the time, Propel Insurance, agreed to a stipulated injunction that restricted Swan's and Whipple's access to AP information that Swan had secreted to three thumb drives and sent to a personal Comcast e-mail account.

155.    Whipple and Swan have obstructed AP's ability to determine whether either of them accessed AP's trade secret information. Those efforts at obstruction include the following: (a) Whipple and Swan, through counsel, have refused AP's repeated requests that they voluntarily submit their devices and accounts to a neutral third party for the limited purpose of searching for evidence of the files they accessed after separating from AP; and (b) in response to AP's inquiries, neither Whipple nor Swan identified temporary communication devices that, on information and belief, both used following their separation from AP.

**Count (1)**
**(Improper Acquisition – Swan, Whipple, and Holt)**

156.    Whipple and Swan accessed AP trade secret information on several occasions, including after AP notified them of their separation of employment, from May 9 through May 16, 2022, and did so with knowledge that the access was unauthorized and improper.

157.    Over the 2022 Memorial Day weekend, following the mass deletion of files on May 27, 2022, Holt accessed AP trade secret information on May 31, 2022, the day after she received an offer of employment from CAC. Included in the documents that Holt accessed on May 31,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503-552-2140 | Fax: 503-224-4518

2022, was trade secret information concerning AP client CHG.  Holt subsequently communicated with Denson at CAC to support his effort to solicit business that Holt intended to support as a CAC employee.

158.    On information and belief, Holt accessed AP trade secret information over the 2022 Memorial Day weekend for the unauthorized purpose of aiding herself and CAC.

159.    On information and belief, Whipple and Swan acquired AP's trade secret information after accessing it without authority, whether by transferring the information electronically, by hand, or by memory.

160.    On information and belief, Holt acquired AP's trade secret information after accessing it without authority, whether by transferring the information electronically, by hand, or by memory.

**Count (2)**
**(Disclosure or Use – Swan, Whipple, Holt, and CAC)**

161.    After CAC hired Whipple, Swan, and Holt as its employees, CAC induced them to breach their duty to maintain the secrecy of AP's trade secrets by offering to indemnify, defend, and hold them harmless from any and all damages resulting from such a breach of secrecy, including any damages award that they might be ordered to pay by this Court for a verified breach of the DTSA.  With respect to claims in this lawsuit, including the claim that Whipple, Swan, and Holt violated the DTSA, CAC excluded from its offer of indemnity only "errors or omissions," whether alleged or actual, that arose prior to the first day of their employment at CAC.

162.    On information and belief, Whipple and Swan improperly disclosed or used AP's trade secrets, including information about AP client revenue that they planned to have follow them to CAC, (a) in negotiating with CAC the appropriate level of initial compensation as CAC employees; and, once employed by CAC, (b) in targeting AP clients to transfer business to CAC to justify their high salaries at CAC, including AP clients IHC, OSL, RHC, R, and MSLH.

163.    On information and belief, Holt improperly disclosed or used AP's trade secrets, including information about AP client revenue that she planned to have follow her to CAC, (a) in negotiating with CAC the appropriate level of her initial compensation as CAC employees; and,

once employed by CAC, (b) in targeting AP clients to transfer business to CAC to justify her high salary at CAC, including AP client CHG.

### Count (3)
### (Threatened Disclosure or Use – Swan, Whipple, Holt, and CAC)

164.    The circumstances of Whipple's, Swan's, and Holt's acquisition of AP's trade secret information, their conduct prior and subsequent to acquisition of AP's trade secret information, and the transfer of AP clients to CAC, as alleged above, shows an intent to misappropriate AP trade secret information by Whipple, Swan, Holt, and CAC.

165.    Pursuant to 18 USC 1836(b)(3), AP is entitled to injunctive relief to prevent actual or threatened misappropriation, actual damages and disgorgement of unjust enrichment, or, alternatively, a reasonable royalty; an award of double-damages; and an award of reasonable attorney's fees.

166.    Each of the acts of misappropriation, as alleged above, was done willfully and with malice, and AP is entitled to exemplary damages in an amount to be proved at trial pursuant to 18 USC 1836(b)(3).

### FIFTH CLAIM FOR RELIEF
### Violations of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030
### (Against Swan and Whipple)

167.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

168.    After termination, Swan and Whipple accessed without authorization, or exceeded authorized access of AP's computers and computer systems which are involved in interstate and foreign commerce and communication and thereby acquired, communicated, and/or deleted AP's property, including confidential and competitively sensitive information.

169.    Swan and Whipple acted knowingly and with intent to harm caused damages and loss to AP in excess of $5,000 by deleting data, and obtaining and transmitting information for personal use, which they were not entitled to obtain and/or transmit.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

170.    Under the Consumer Fraud and Abuse Act, AP is entitled to injunctive relief and other legal and equitable relief, damages, and attorney's fees, in amounts to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Tortious Interference with Economic Relations
### (Against CAC and Whipple)

171.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

172.    AP has advantageous business relationships with its employees, clients, and prospective clients in which it has an economic expectancy.

173.    AP has valid contracts with its employees that restrict their ability to, among other things, (a) disclose or use confidential information about its clients and employees; (b) solicit or transact business with AP's customers; or (c) solicit AP's employees.  These contracts included, relevant here, the Swan RCA, the Holt RCA, and the Wiltse RCA.

174.    At all relevant times, CAC and Whipple knew that AP had advantageous business relationships with its clients, prospects and employees and valid contracts with its employees and, in the case of CAC, first sought to purchase Whipple's and Swan's books of business.

175.    On information and belief, CAC knew that it could not support the salaries it promised to pay Holt and Swan unless a material portion of their books of business followed them from AP to CAC.

176.    On information and belief, CAC hired Holt and Swan with the intent that they transact business with AP's clients that followed them to CAC, either directly or through proxies at CAC like Whipple, and, in doing so, trade on AP confidential information and goodwill regarding AP's clients in violation of their respective RCAs.

177.    On information and belief, CAC solicited AP employees L, H, and Wiltse as part of a broader effort at an employee lift-out with the intent that the employees support Swan, Whipple, and/or Holt in servicing AP clients who transferred their business to CAC, either directly or through proxies like Whipple, by trading on AP confidential information and goodwill regarding AP's clients in violation of the Swan RCA, Holt RCA, and the employees' RCAs.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

178.    On information and belief, CAC hired Whipple with the intent that, because he had not signed an RCA with AP, he would act as a proxy for Swan and Holt and accomplish for them indirectly what they could not accomplish directly under their RCAs.  On information and belief, Whipple has acted as a proxy with respect to soliciting and servicing AP clients that Swan had serviced at AP and who have transferred to CAC, including IHC, OSL, RHC, R, and MSLH.

179.    CAC's and Whipple's interference with AP's valid contracts with Swan, Holt, and Wiltse has been successful.  On information and belief, AP clients and prospective clients IHC, OSL, RHC, R., CHG, and MSLH, transferred their business from AP to CAC with the intention that Swan, Holt, and/or Wiltse continue to be involved in servicing their accounts.

180.    AP is entitled to injunctive relief, actual damages, disgorgement of profits as a result of CAC's and Whipple's interference in an amount to be established at trial.

## SEVENTH CLAIM FOR RELIEF
### Promissory Estoppel
### (Against Scott, Susan, Swan, and Holt)

181.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

182.    AP provided Scott, Susan, Swan, and Holt with compensation and other benefits and access to its property and confidential information in reasonable reliance on their agreement to comply with the restrictive covenants in their respective RCAs.

183.    Failure to enforce Scott's, Susan's, Swan's, and Holt's agreements with AP would result in injustice and unjust enrichment.

184.    AP is entitled to injunctive relief, actual damages, disgorgement of profits, and an award of its reasonable attorney's fees and costs of litigation pursuant to the Scott's, Susan's, Swan's, and Holt's respective RCA.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

185.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

186.    Scott, Susan, and S&S received benefits from Scott's diversion of fees from AP clients and prospective clients to himself and/or S&S in an amount that exceeds $750,000.

187.    Swan, Whipple, Holt, and CAC received benefits from Swan's, Whipple's, and Holt's use of AP's confidential information and customer goodwill, causing at least seven AP customers to transfer business from AP to CAC.

188.    The benefit received by Defendants was at AP's expense.

189.    The circumstances make it unjust for Defendants to receive the benefit without payment to AP.

190.    AP is entitled to injunctive relief in the form of an order preventing Defendants from benefiting from AP confidential information and customer relationships; imposing a constructive trust; disgorging profits; and actual damages.

### NINTH CLAIM FOR RELIEF
**Money Had and Received**
**(Against Scott and S&S)**

191.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

192.    Scott's diversion of fees from AP clients and prospective clients resulted in his and S&S's receipt of money in an amount exceeding $750,000 resulting in unjust enrichment at AP's expense. The money in equity and good conscience should be paid over to AP with interest.

### TENTH CLAIM FOR RELIEF
**Conversion**
**(Against Scott, Susan, Whipple, Swan, and S&S)**

193.    AP incorporates by reference its allegations set forth in the foregoing paragraphs of this Third Amended Complaint as if fully set forth herein.

194.    By diverting fees that rightfully belong to AP, Scott, individually and through S&S, unlawfully and intentionally exercised dominion and control over AP property and interfered with AP's right to control its disposition.

195.    Scott and Susan also expensed personal items to AP, converting AP's funds to their own personal use and enjoyment.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503-552-2140 | Fax: 503-224-4518

196.    Scott, Susan, Whipple, Swan, and S&S entered into a civil conspiracy to convert AP's property as part of a common plan or design.

197.    Scott, Susan, Whipple, Swan and S&S aided and abetted Scott and S&S in converting AP's property.

198.    As a direct and proximate result of the acts of conversion, AP has been damaged and continues to be damaged in an amount in excess of $750,000, and is entitled to full repayment of that amount, plus prejudgment interest.

## ELEVENTH CLAIM FOR RELIEF
### Temporary, Preliminary, and Permanent Injunction
### (As to All Defendants)

199.    In the absence of injunctive relief requested herein, AP will suffer and has suffered irreparable harm, including, but not limited, loss of clients and employees, disclosure of client information to a competitor, loss of goodwill and business reputation, and unknown economic loss.

200.    AP will suffer irreparable harm unless an order issues that enjoins Defendants from violating their respective contractual and fiduciary duties to AP and/or aiding and abetting the same.  AP has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff AssuredPartners of Oregon, LLC, prays for the following relief:

(a)    Actual damages;

(b)    Imposition of a constructive trust and disgorgement from Defendants of profits wrongfully obtained;

(c)    Injunctive relief in the form of an order directing the Individual Defendants to comply with their contractual and/or fiduciary duties and directing CAC and Whipple to refrain from tortiously interfering with AP's economic relations;

(d)    Injunctive relief in the form of an order directing the return of AP property wrongfully converted;

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518

(e)     Equitable relief in the form of an order that tolls and extends the restricted period in the RCAs for a period of time equal to the period an Individual Defendant has been in breach of the RCA so that AP obtains the bargained-for benefits of the RCA.

(f)     Punitive damages under 18 USC 1836(b); and Oregon common law;

(g)     An award of AP's reasonable attorney's fees and costs of litigation pursuant to 18 USC 1836(b); the RCAs, and applicable law;

(h)     The imposition of a reasonable royalty for CAC's, Swan's, Whipple's, and Holt's unauthorized disclosure or use of AP's trade secrets;

(i)     For prejudgment interest on all damages recovered at the rate set forth by statute; and

(j)     For such other and further relief as the Court deems just and necessary.

DATED: February 3, 2023

OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.


*/s/ James Barrett*
James Barrett, OSB No. 011991
james.barrett@ogletree.com
The KOIN Center
222 SW Columbia Street, Suite 1500
Portland, Oregon 97201
Tel: (503) 552-2145
Fax: (503) 816-0598

Todd J. Kaiser, IN Atty No. 10846-49
todd.kaiser@ogletree.com
*Admitted Pro Hac Vice*
111 Monument Circle, Suite 4600
Indianapolis, IN  46204
Tel: (317) 916-2155

*Attorneys for Plaintiff*

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503-552-2140 | Fax: 503-224-4518
54907873.v1-OGLETREE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2023, I served the foregoing **THIRD AMENDED COMPLAINT** on the parties below by electronic means through the Court's eFile and Serve system and electronic mail:

Arden J. Olson
Julian W. Marrs
Randolph Geller
Harrang Long Gary Rudnick P.C.
497 Oakway Road, Suite 380
Eugene, OR 97401
Tel: 541-485-0220
Email: arden.j.olson@harrang.com
       julian.marrs@harrang.com
       randy.geller@harrang.com

Attorneys for Defendants, G. Scott Reese,
   Susan Reese and S&S Investments
   Management, LLC

Alexandra M. Shulman
Leah C. Lively
Buchalter, A Professional Corporation
805 S.W. Broadway
Suite 1500
Portland, OR 97204
Tel: 503-226-1191
Email: ashulman@buchalter.com
       llively@buchalter.com

Attorneys for Defendants Carl Swan, Alex
   Whipple

Karen L. O'Connor
Timothy W. Snider
Todd A Hanchett
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: 503-224-3380
Email: karen.oconnor@stoel.com
       timothy.snider@stoel.com
       todd.hanchett@stoel.com

Attorneys for Cobb Allen Capital, LLC
   and Bruce Denson, Jr.

William Ojile
   *Admitted Pro Hac Vice*
Armstrong Teasdale LLP
6400 S Fiddlers Green Circle
Suite 1820
Denver, CO 80111
Tel: 303-575-4000
Email: bojile@armstrongteasdale.com

Attorneys for Cobb Allen Capital, LLC and
   Bruce Denson, Jr.

☐    by mailing a true and correct copy to address for the persons listed above.

☐    by causing a true and correct copy to be hand-delivered to the address of each person
     listed above. It was contained in a sealed envelope and addressed as stated above.

■    by e-mailing a true and correct copy to the persons listed:

Dated: February 3, 2023

*/s/ James M. Barrett*
James M. Barrett, OSB No. 011991
james.barrett@ogletreedeakins.com

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503-552-2140 | Fax: 503-224-4518